RECORD NOS. 14-1081(L); 14-1125 XAP

In The

# United States Court Of Appeals
## For The Fourth Circuit

**KENNETH L. HUNTER; RICK A. DONATHAN; JERRY D. MEDLIN,**

*Plaintiffs – Appellees/Cross-Appellants,*

v.

**TOWN OF MOCKSVILLE, NORTH CAROLINA;
ROBERT W. COOK, in his official capacity as Administrative Chief of
Police of the Mocksville Police Department and in his individual capacity;
CHRISTINE W. BRALLEY, in her official capacity as Town Manager of
the Town of Mocksville and in her individual capacity,**

*Defendants – Appellants/Cross-Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO**

————————————

**BRIEF OF APPELLANTS/CROSS-APPELLEES**

————————————

Jaye E. Bingham-Hinch
CRANFILL, SUMNER
 & HARTZOG, LLP
5420 Wade Park Boulevard
P.O. Box 27808
Raleigh, NC  27611
(919) 828-5100

*Counsel for Appellants/
 Cross-Appellees*

Patrick H. Flanagan
CRANFILL, SUMNER
 & HARTZOG, LLP
P.O. Box 30787
Charlotte, NC  28230
(704) 940-3419

*Counsel for Appellants/
 Cross-Appellees*

Philip M. Van Hoy
Stephen J. Dunn
VAN HOY, REUTLINGER,
 ADAMS & DUNN
737 East Boulevard
Charlotte, NC  28203
(704) 375-6022

*Counsel for Appellants/
 Cross-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.      Does party/amicus have any parent corporations?                          YES     NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                          YES     NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    YES    NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    YES    NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____    _____
(signature)                                                    (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO

2.     Does party/amicus have any parent corporations?                    YES     NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                    YES     NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      YES    NO
         If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES    NO
         If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      YES    NO
         If yes, identify any trustee and the members of any creditors' committee:

Signature: _____          Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************
I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                    _____
        (signature)                                              (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.      Does party/amicus have any parent corporations?                      YES     NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                      YES     NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    YES    NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    YES    NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************
I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____        _____
(signature)                                    (date)

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION .................................................................1

STATEMENT OF ISSUES ................................................................................6

STATEMENT OF THE CASE...........................................................................6

    STATEMENT OF THE FACTS ...................................................................8

SUMMARY OF THE ARGUMENT ...............................................................21

ARGUMENT ...................................................................................................22

    I.     STANDARD OF REVIEW ...............................................................22

    II.    DEFENDANTS ARE ENTITLED TO SUMMARY
        JUDGMENT ON PLAINTIFFS' STATE AND FEDERAL
        FIRST AMENDMENT RETALIATION CLAIMS ...........................23

        A.    Plaintiffs' speech was not protected because they spoke
             as employees, not as citizens ....................................................23

            1.    Whether the Plaintiffs spoke as employees or
                 citizens is a threshold issue.............................................24

            2.    Speech can be part of a public employee's official
                 duties even if it is not required by the employer or
                 contained in a job description........................................24

            3.    Investigating and reporting crime is the core
                 responsibility of sworn police officers ...........................26

            B.    Plaintiffs' speech was not the "but for" cause of their
             termination ...............................................................................31

i

1.     Chief Cook Was Unaware the Plaintiffs Had Called the Governor's Office When He Decided to Terminate the Plaintiffs' Employment ...........................32

2.     Chief Cook Had Legitimate Reasons for Terminating the Plaintiffs' Employment ......................33

III.     THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY...................................................33

CONCLUSION ....................................................................39

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ii

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Anderson v. Creighton*,
438 U.S. 635, 107 S. Ct. 30, 97 L. Ed. 2d 523 (1987) ...........................33, 35

*Andrew v. Clark*,
561 F.3d 261 (4th Cir. 2009) .........................................................37, 38, 39

*Anemone v. Metro. Transp. Auth.*,
629 F.3d 97 (2d Cir. 2009) .......................................................................29

*Beale v. Hardy*,
769 F.2d 213 (4th Cir. 1985) ....................................................................32

*Behrens v. Pelletier*,
516 U.S. 299 (1996)....................................................................................5

*Brady v. County of Suffolk*,
657 F. Supp. 2d 331 (EDNY 2009)...........................................................28

*Brammer-Hoelter v. Twin Peaks Charter Academy*,
492 F.3d 1192 (10th Cir. 2007) ................................................................25

*Boyce v. Andrew*,
510 F.3d 1333 (11th Cir. 2007) ................................................................24

*Chaklos v. Stevens*,
560 F.3d 705 (7th Cir. 2009) ....................................................................24

*Cheek v. City of Edwardsville, Kansas*,
514 F. Supp. 2d 1220 (D. Kansas 2007)...................................................30

*Davis v. McKinney*,
518 F.3d 304 (5th Cir. 2008) ....................................................................24

*DiMeglio v. Haines,*
  45 F.3d 790 (4th Cir. 1995) ..........................................................36

*Drewitt v. Pratt,*
  999 F.2d 774 (4th Cir. 1994) ........................................................22

*Dunbar v. Lindsey,*
  905 F.2d 754 (4th Cir. 1990) ........................................................35

*Durham v. Jones,*
  737 F.3d 291 (4th Cir. 2013) ...........................................37, 38, 39

*Edwards v. City of Goldsboro,*
  178 F.3d 231 (4th Cir. 1999) ........................................................34

*Freitag v. Ayers,*
  468 F.3d 528 (9th Cir. 2006) ........................................................25

*Garcetti v. Ceballos,*
  547 U.S. 410, 164 L. Ed. 2d 689, 126 S. Ct. 1951 (2006) ...................*passim*

*Hamilton v. Mayor & City Council of Baltimore,*
  807 F. Supp. 2d 331 (D. Md. 2011)................................................28

*Harlow v. Fitzgerald,*
  457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) .......................34, 35

*Higgins v. E. I. Dupont de Nemours & Co.,*
  863 F.2d 1162 (4th Cir. 1988) ......................................................22

*Huang v. UNC Board of Governors,*
  902 F.2d 1134 (4th Cir. 1990) ......................................................31

*Hughes v. Bedsole,*
  48 F.3d 1376 (4th Cir. 1995) ........................................................33

*Hunter v. Bryant,*
  502 U.S. 224, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) ...........................35

iv

*Jenkins v. Medford*,
119 F.3d 1156 (4th Cir. 1997) ...............................................................5

*Johnson v. Jones*,
515 U.S. 304 (1995)...............................................................................5

*Malley v. Briggs*,
475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) .............................35

*Maciariello v. Sumner*,
973 F.2d 295 (4th Cir. 1992) ...............................................................35

*McVey v. Stacy*,
157 F.3d 271 (4th Cir. 1998) ...........................................................35, 36

*Mills v. City of Evansville*,
452 F.3d 646 (7th Cir. 2006) ...............................................................25

*Mitchell v. Forsyth*,
472 U.S. 511 (1985)...........................................................................4, 5

*Morales v. Jones*,
494 F.3d 590 (7th Cir. 2007) ...........................................................27, 28

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 471 (1977) .......................................31

*O'Bar v. J.C. Pinion*,
953 F.2d 74 (4th Cir. 1991) ...............................................................5

*Parrish v. Cleveland*,
372 F.3d 294 (4th Cir. 2004) ...............................................................4

*Phillips v. City of Dawsonville*,
499 F.3d 1239 (11th Cir. 2007) ...............................................................25

*Sigsworth v. City of Aurora, Illinois*,
487 F.3d 506 (7th Cir. 2007) ...........................................................29, 30

v

*Wagner v. Wheeler*,
13 F.3d 86 (4th Cir. 1993) ...................................................................31

*Weintraub v. Board of Education*,
593 F.3d 196 (2d Cir. 2010) .............................................................25

*Weisbarth v. Geauga Park Dist.*,
499 F.3d 538 (6th Cir. 2007) ............................................................24

*Williams v. Dallas Indep. Sch. Dist.*,
480 F.3d 689 (5th Cir. 2007) ............................................................25

*Wilson v. Kittoe*,
337 F.3d 392 (4th Cir. 2003) ............................................................36

*Wilson v. Layne*,
526 U.S. 603, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) ..........................34

## **STATUTES**

28 U.S.C. § 1291 ........................................................................................4

28 U.S.C. § 1331 ........................................................................................2

28 U.S.C. § 1367(a) ...................................................................................2

28 U.S.C. § 1441(b) ..................................................................................2

42 U.S.C. § 1983 ...............................................................................*passim*

## **CONSTITUTIONAL PROVISIONS**

N.C. Const. amend. I ................................................................................6

U.S. Const. amend. I ........................................................................*passim*

vi

## **<u>RULES</u>**

Fed. R. Civ. P. 56 .................................................................................7, 22

Fed. R. Civ. P. 56(a) ...............................................................................22

NOS.:  14-1081 (L); 14-1125 XAP
IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

(1:12-CV-00333-CCE-JEP)

| | | |
|---|---|---|
| KENNETH L. HUNTER, RICK A. DONATHAN, and JERRY D. MEDLIN, | ) ) ) | |
| Plaintiffs – Appellees/ Cross-Appellants | ) ) ) ) | |
| v. | ) ) | **BRIEF OF APPELLANTS** |
| TOWN OF MOCKSVILLE, NORTH CAROLINA; ROBERT W. COOK, in his official capacity as Administrative Chief of the Mocksville Police Department and in his individual capacity; CHRISTINE W. BRALLEY, in her official capacity as Town Manager of the Town of Mocksville and in her individual capacity, | ) ) ) ) ) ) ) ) ) | |
| Defendants – Appellants/ Cross-Appellees | ) ) ) | |

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Plaintiff-Appellees Kenneth L. Hunter, Rick A. Donathan and Jerry D.

Medlin ("Plaintiffs") assert that Defendants-Appellants Town of Mocksville

("Town"), Robert W. Cook ("Cook"), and Christine W. Bralley ("Bralley")

wrongfully terminated them in violation of their First Amendment rights after they

reported to the North Carolina Governor's office alleged criminal misconduct by

the Mocksville Police Department and Police Chief.  Plaintiffs, all former police officers with the Mocksville Police Department, claim that they were not terminated due to their own misconduct, but for reasons that violate the First Amendment to the United States Constitution and in contravention of North Carolina Public Policy.

Plaintiffs filed their Complaint on April 5, 2012, asserting claims against Cook and Bralley, individually, pursuant to 42 U.S.C. § 1983 for violation of their First Amendment rights under the United States Constitution.  (JA pp. 44-46).  Plaintiffs also asserted a § 1983 claim against the Town for alleged unconstitutional policies.  (JA pp. 44-46).  Finally, Plaintiffs asserted state claims against Bralley, Cook, and the Town for violation of their rights under the North Carolina State Constitution and wrongful discharge in violation of North Carolina public policy.  (JA pp. 46-49).

Plaintiffs' action was filed in the Middle District of North Carolina. Because federal claims were asserted, federal court jurisdiction existed pursuant to 28 U.S.C. § 1331 and § 1441(b).  The District Court, in its discretion, exercised supplemental jurisdiction over plaintiff's state claims pursuant to 28 U.S.C. § 1367(a).

On May 31, 2013, all Defendants filed a Motion for Summary Judgment as to all of Plaintiffs' claims.  Cook and Bralley asserted qualified immunity as a

basis for their Motion for Summary Judgment as to the First Amendment claim. (JA p. 63).

On September 16, 2013, Judge Catherine C. Eagles filed an Order granting in part and denying in part Defendants' Motion for Summary Judgment. Judge Eagles determined, among other rulings, that the Plaintiffs' § 1983 claims against Cook and Bralley were barred by the individual Defendants' qualified immunity. (JA pp. 3362-3363).

On October 1, 2013, Plaintiffs filed a Motion to Alter or Amend Judgment and Motion for Relief of Judgment. Plaintiffs asked the Court to reconsider the issue of qualified immunity and deny summary judgment to the individual Defendants on Plaintiffs' § 1983 claims. (JA pp. 3364-3368). On October 9, 2013, the Court denied Plaintiffs' Motion to Alter or Amend Judgment and Motion for Relief from Judgment. (JA p. 3369).

On October 21, 2013, Judge Eagles filed an opinion explaining the Court's ruling and reiterated that the individual Defendants were entitled to qualified immunity on the § 1983 claim and that there was no evidence that the Town had a policy of retaliation, so all § 1983 claims were dismissed. The Court found that the related state law claims survived and could proceed to trial. (JA pp. 3370-3389).

On December 23, 2013, Plaintiffs' filed a Supplemental Motion to Alter or Amend Judgment and Motion for Relief from Judgment renewing their request that

the Court reconsider its granting of summary judgment to the individual Defendants with respect to Plaintiffs' § 1983 claims.   (JA pp. 3390-3394).

On January 22, 2014, Judge Eagles issued an Order granting Plaintiffs' Supplemental Motion to Alter or Amend Judgment and Motion for Relief from Judgment.   The Court's October 21, 2013 Order was vacated to the extent it granted Defendants' Motion for Summary Judgment as to Cook and Bralley.  (JA pp. 3395-3397).

On January 27, 2014, Defendants filed a Notice of Appeal with the Fourth Circuit.  (JA pp. 3398-3402).   While not a final order, Judge Eagles' rulings wherein she denied the Defendants' Motion for Summary Judgment is immediately appealable, pursuant to 28 U.S.C. § 1291 and the collateral order doctrine, as these rulings denied the individual Defendants' claim that they were entitled to prevail as a matter of law based on qualified immunity. *Parrish v. Cleveland*, 372 F.3d 294, 301 (4th Cir. 2004); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

Pursuant to 28 U.S.C. § 1291 and the collateral order doctrine, questions of law pertaining to qualified immunity are immediately appealable.  *Parrish*, 372 F.3d at 301.  "[A] district court's order denying a defendant's summary judgment motion [i]s an immediately appealable 'collateral order' (*i.e.*, a 'final decision') . . . where (1) the defendant was a public official asserting a qualified immunity defense, and (2) the issue appealed concerned, not which facts the parties might be

able to prove, but, rather, whether or not certain given facts show a violation of 'clearly established' law." *Johnson v. Jones*, 515 U.S. 304, 304-05 (1995).

The purpose of qualified and public official immunity is to protect individual Defendants, where applicable, from having to participate in protracted litigation. Based on the underlying purpose of this immunity, courts have ruled that an immediate appeal lies from the denial of a motion for summary judgment based on qualified immunity. In *Mitchell*, 472 U.S. 511, 526-527 (1985), the Supreme Court stated that the defense of qualified immunity is designed not only to protect government officials from liability for money damages, but also to allow officials to avoid the burdens attendant to a lawsuit. In other words, qualified immunity "is an immunity from suit rather than a mere defense to liability." *Id.*; *See also Behrens v. Pelletier*, 516 U.S. 299, 305-306 (1996), and *Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997).

To the extent that any claims involved in this appeal are not immediately appealable on the above noted grounds, said claims are so intertwined with the other claims, with many sharing the same elements and/or being dependent upon each other, that Judge Eagle's ruling denying the Defendants' Motion for Summary Judgment should be reviewed at this time pursuant to the doctrine of pendant appellate jurisdiction. *O'Bar v. J.C. Pinion*, 953 F.2d 74, 80 (4th Cir. 1991). Accordingly, all claims are properly before this Court at this time.

## STATEMENT OF ISSUES

1.      Whether the trial court erred in ruling that Plaintiffs spoke as citizens, not employees, under *Garcetti v. Ceballos*, 547 U.S. 410, 164 L. Ed. 2d 689, 126 S. Ct. 1951 (2006).

2.      Whether the trial court erred in denying qualified immunity to Defendants Cook and Bralley.

## STATEMENT OF THE CASE

This matter arises out of the termination of the Plaintiffs' employment with the Town of Mocksville on December 29, 2011.

Plaintiffs filed this action on April 5, 2012, alleging three claims for relief arising out of their termination, specifically: violation of their First Amendment rights under the United States Constitution; violation of their First Amendment rights under the North Carolina State Constitution; and wrongful discharge in violation of North Carolina public policy.  Plaintiffs seek compensatory damages against all three Defendants, punitive damages, and injunctive relief.  (JA pp. 44-49).

Defendants filed an Answer to the Plaintiffs' Complaint on June 14, 2012, denying all allegations of wrongdoing and asserting numerous defenses, including qualified immunity.   Defendants moved for Summary Judgment on all of

Plaintiffs' claims pursuant to Rule 56 of the Federal Rules of Civil Procedure on May 31, 2013. (JA pp. 63-65).

On September 16, 2013, Judge Catherine C. Eagles filed an Order granting in part and denying in part Defendants' Motion for Summary Judgment. Specifically, Judge Eagles found that, "Plaintiffs' § 1983 claims are barred by the Defendants' qualified immunity," but that there was, "a disputed question of material fact as to whether the Defendants violated the Plaintiffs' federal and state constitutional rights and whether the Plaintiffs were terminated for a purpose that contravenes public policy." Judge Eagles dismissed all claims against the individual Defendants, the § 1983 claim against the Town, and the punitive damages claim, but allowed the state law claims to proceed to trial. (JA pp. 3362-3363).

On October 21, 2013, Judge Eagles filed an opinion explaining the Court's ruling and reiterated that the individual Defendants were entitled to qualified immunity on the § 1983 claim and that there was no evidence that the Town had a policy of retaliation, so all § 1983 claims were dismissed. The Court found that the related state law claims survived and could proceed to trial. (JA pp. 3370-3389).

On December 23, 2013, Plaintiffs' filed a Supplemental Motion to Alter or Amend Judgment and Motion for Relief from Judgment renewing their request that

the Court reconsider its granting of summary judgment to the individual Defendants.   (JA pp. 3390-3394).

On January 22, 2014, Judge Eagles issued an Order granting Plaintiffs' Supplemental Motion to Alter or Amend Judgment and Motion for Relief from Judgment. The Court's October 21, 2013 Order was vacated to the extent it granted Defendants' Motion for Summary Judgment as to Cook and Bralley.   (JA pp. 3395-3397).

On January 27, 2014, Defendants filed a Notice of Appeal with the Fourth Circuit.   (JA pp. 3398-3402).   For the reasons set forth below, Defendants now request that Judge Eagles' rulings, wherein she denied summary judgment for Defendants, be reversed and that all claims in this action be dismissed.

## STATEMENT OF THE FACTS

The Town of Mocksville is a small municipal corporation in Davie County, North Carolina, duly organized and existing under the laws of North Carolina.   Its elected officials include a Mayor and a Board of Commissioners with five members.   (Affidavit of Henry P. Van Hoy, II ¶ 7; JA p. 103).   Christine Bralley has been the Town Manager since 2002.   (Affidavit of Christine W. Bralley ¶ 2; JA p. 74).   Mocksville operates under a council-manager form of government whereby the Mayor and Commissioners set the policies of the Town.   (Bralley aff. ¶ 3; JA pp. 74-75).   Bralley's job is to enforce Town policy and manage its day to day

8

operations.  Bralley has the delegated authority to hire and fire Town employees.  (Bralley aff. ¶ 3; JA pp. 74-75).

The Town has no progressive discipline policy, grievance policy, nor any other policy or ordinance requiring procedural due process in connection with employee discipline or discharge.  (Bralley aff. ¶ 5; JA p. 75).  However, Bralley has an open door policy with regard to employee complaints.  (Bralley aff. ¶ 7; JA p. 75).  She communicates to employees that they may meet with her to discuss any aspect of their employment, including their discharges.  (Van Hoy aff. ¶ 13; JA p. 105).

Bralley hired Robert Cook as the Town's administrative police chief in 2005 and delegated to him the authority to hire and fire employees of the Mocksville Police Department.  (Bralley aff. ¶ 4; JA p. 75).  Cook served as Chief until the date of his retirement on May 31, 2013.  (Affidavit of Robert W. Cook ¶ 2; JA p. 66).

Daniel Matthews has been employed by the MPD since 1992.  At the time of the Plaintiffs' terminations, Matthews was Deputy Chief.  (Affidavit of Daniel Matthews ¶ 2; JA pp. 84-85). At different times, Matthews has supervised all three Plaintiffs, thus he has had the opportunity to observe their various performance and conduct issues, which he brought to Chief Cook's attention.  (Matthews aff. ¶ 3; JA p. 85).

Cook's management style is to counsel employees about performance and conduct issues verbally instead of in writing. He prefers this approach so it does not appear as though he is micro-managing employees by writing them up. (Cook aff. ¶ 21; JA p. 72, Matthews aff. ¶ 3; JA p. 85). Based on his own observations and information reported to him by Matthews and others, Chief Cook developed a number of concerns about the Plaintiffs' performance and conduct. (Cook aff. ¶ 6-16; JA pp. 67-71).

Kenneth Hunter sometimes missed work without properly informing Matthews. (Matthews aff. ¶ 7; JA pp. 86-87). He frequently was slow in responding to Matthews, or ignored him. When he did respond, Hunter was often sarcastic. (Matthews aff. ¶ 7; JA pp. 86-87). On one occasion, Hunter lied to Matthews and Cook. (Matthews aff. ¶ 7; JA pp. 86-87, Cook aff. ¶ 6; JA pp. 67-68). He resisted Cook's requests for information and directives. He defied an order that officers remain within the Town while on duty. It was reported to Cook that Hunter often went to Yadkinville while on duty to have lunch with a friend, and that he had gone to a golf course in Salisbury while on duty. (Cook aff. ¶ 7; JA p. 68).

Bralley received multiple complaints about Hunter's supervision of officers. For example, MPD Officer Stuart Shore reported to Bralley that Hunter had told Shore that Hunter and Medlin had a way of "planting things on people if they

needed to." Shore told Bralley he did not feel that he was in a safe working environment and he interpreted Hunter's statement about planting evidence as retaliation for Shore's refusal to go out of town on duty with Hunter in violation of Chief Cook's orders. (Bralley aff. ¶ 16; JA p. 79). Hunter's harassment of Shore was one of several concerns Cook had about Hunter's conduct, including various acts of insubordination, being late for meetings, refusing to confer awards on other officers, and failing to pass along orders to subordinates. (Cook aff. ¶ 11; JA p. 70).

Donathan ignored orders, was late turning in reports, and left his assigned patrol car with the engine running. (Matthews aff. ¶ 6; JA p. 86). He was repeatedly late for work and went to firearms training in improper attire, without his weapon. (Matthews aff. ¶ 6; JA p. 86). On one occasion, Donathan told a rookie officer he would not back up the officer on a traffic stop. (Cook aff. ¶ 13; JA p. 70). Cook received reports that Donathan failed to pass along instructions about where to patrol, hung around the office instead of going out on patrol, failed to complete his daily logs, and constantly turned in his time sheets late or incorrectly. (Cook aff. ¶ 14; JA pp. 70-71).

Donathan operated his own sign-making business called Global Graphics. (Donathan dep. pp. 16-17; JA pp. 110-112). Bralley received multiple complaints from a Town Council member that Donathan was working on his side business

while on duty for the MPD. (Bralley aff. ¶ 14; JA p. 78). Cook was concerned that Donathan was spending too much time on this side business. (Cook aff. ¶ 13; JA p. 70). On one occasion Donathan even told Bralley he would continue to make signs in his private business even if they violated Town ordinances. He said, "Let the property owner deal with the consequences." (Bralley aff. ¶ 14; JA p. 78).

Bralley had made it clear to MPD officers on more than one occasion that Town-owned cell phones were not to be used for personal calls. However, Donathan asked her, "Do you mean I can't call my mama while I'm on duty?" and she responded, "Unless it's an emergency, you don't need to be calling anyone on your town cellphone while you're on duty. That's for Town use only." (Bralley aff. ¶ 7; JA pp. 75-76). However, Donathan violated this instruction and continued using his Town-owned cell phone for excessive personal calls. (Matthews aff. ¶ 6; JA p. 86, Bralley aff. ¶ 15; JA pp. 78-79, Cook aff. ¶ 13; JA p. 70).

Matthews observed Jerry Medlin violating Chief Cook's order to remain within the Town of Mocksville while on duty. (Matthews aff. ¶ 8; JA p. 87, Cook aff. ¶ 7; JA p. 68). Medlin also failed to comply with Chief Cook's instruction to provide information about ongoing cases. (Cook aff. ¶ 7; JA p. 68). Bralley was aware of Medlin's improper use of his Town-owned cell phone. (Bralley aff. ¶ 15; JA pp. 78-79).

In Cook's assessment, Medlin was only "half doing" his duties during the last year of his employment. (Cook aff. ¶ 8; JA pp. 68-69). On one occasion, Medlin went hunting and killed a deer while out of work on a leave of absence for supposedly being sick. On another occasion he went to Salisbury to pick up a golf club while on duty with Hunter. Medlin missed several trainings and firearm qualification sessions, and went out of town while on duty. Medlin used a Town-owned camera on a family trip to Florida and allowed his son to take a Town-owned GPS on a family trip to Chicago. Cook spoke to Medlin often about these matters. (Cook aff. ¶ 8; JA pp. 68-69).

In November 2011, Cook reorganized the MPD and promoted Matthews to Deputy Chief. Cook reassigned some of Hunter's duties, but there was no change to Hunter's rank, pay, or benefits. (Cook aff. ¶ 5; JA p. 67). The reorganization was motivated in part by reports Cook had received from officers that Hunter was not cooperating in drug cases and that they could not get along with Hunter or trust him. (Cook aff. ¶ 6; JA pp. 67-68). Cook attempted to work with Hunter regarding the reorganization, but Hunter resisted the change. (Cook aff. ¶ 7; JA p. 68).

All sworn officers take an oath to enforce the criminal laws of North Carolina and execute their duties as law enforcement officers. (Cook aff. ¶ 2; JA pp. 66-67). However, in December 2011, Kenneth Hunter met with a suspected

13

drug dealer in his MPD office and knowingly allowed him to leave with illegal drugs in his possession without reporting it to anyone. (Matthews aff. ¶ 7; JA pp. 86-87, Cook aff. ¶ 9; JA p. 69, Hunter dep. pp. 229-233; JA pp. 113-118). Cook later received conflicting reports from Hunter and an administrative secretary about what time the drug dealer had met with Hunter. (Cook aff. ¶ 10; JA pp. 69-70). This was significant because the drug dealer had sold drugs to an undercover officer and Cook suspected Hunter of disclosing an ongoing investigation. (Cook aff. ¶ 9; JA p. 69).

Also in December 2011, Rick Donathan found marijuana in a suspect's car, but did nothing about it. (Cook aff. ¶ 16; JA p. 71, Matthews aff. ¶ 6; JA p. 86). The suspect was a customer of Donathan's side business. (Cook aff. ¶ 16; JA p. 71).

Matthews and Cook discussed all of the above incidents and concerns while the Plaintiffs were still employed. (Cook aff. ¶ 14; JA pp. 70-71, Matthews aff. ¶ 6-7; JA pp. 86-87). It was on the basis of these performance and conduct issues that Cook decided to terminate the Plaintiffs' employment. (Cook aff. ¶ 11-17; JA pp. 70-71).

Prior to the Plaintiffs' termination, Cook met with Bralley to advise her of his intention to fire them and the reasons for his decision. (Bralley aff. ¶ 13-14; JA p. 78). Bralley's normal practice is to consult with the Town Attorney, Henry P.

14

"Hank" Van Hoy, in advance of the termination of a Town employee. (Bralley aff. ¶ 18; JA p. 79). Bralley and Cook consulted with Van Hoy in person and by telephone regarding the Plaintiffs' terminations. (Cook aff. ¶ 17; JA p. 6, Bralley aff. ¶ 18; JA p. 79, Van Hoy aff. ¶ 14; JA p. 105).

Van Hoy advised Cook and Bralley that termination was appropriate and legally justified. (Van Hoy aff. ¶ 14; JA p. 105). Van Hoy personally contributed certain language and approved for legal sufficiency the three written notices received by the Plaintiffs upon their discharge from employment on December 29, 2011. (Van Hoy aff. ¶ 15; JA p. 105).

Plaintiffs contend they were fired for objecting to "corrupt acts" within the MPD and for contacting the Governor's Office to request an independent investigation. (Complaint ¶ 90; JA pp. 44-45).

Over the years, Town employees, including police officers, have met with Bralley to discuss issues within their departments. A number of police officers, including the Plaintiffs, have met with Bralley to discuss problems in the MPD. (Bralley aff. ¶ 8; JA p. 76). In 2009, Medlin told Bralley that Chief Cook had bought beer while on duty. Bralley investigated this allegation and concluded it was not true. She did not tell Chief Cook who had made the report. (Bralley aff. ¶ 9; JA pp. 76-77).

Also in 2009, Bralley received reports that Matthews was "double dipping" by teaching community college classes while on duty with the MPD. Bralley investigated these reports and concluded they were not true. (Bralley aff. ¶ 10; JA p. 77).

Shortly after the MPD reorganization in November 2011, Hunter sent Bralley memoranda containing allegations of Cook's drinking on duty and other improper activities. (Bralley aff. ¶ 11; JA p. 77). Bralley met with Hunter at least twice to discuss his accusations. She asked Hunter if he knew of anything illegal or unethical regarding Cook or other officers and said that, if so, she would call outside authorities to investigate. Hunter stated, "No, not at this time." (Bralley aff. ¶ 11; JA p. 77). Cook was aware of Bralley's open door policy and knew that officers would from time to time meet with her. No officer was ever disciplined for meeting with Bralley. (Bralley aff. ¶ 8; JA p. 76).

In December 2011, just after Cook announced the reorganization of the MPD (including the promotion of Matthews and reassignment of some of Hunter's duties), Hunter and Medlin met with a local Magistrate to discuss taking out charges against Cook. The Magistrate advised that they should talk with the District Attorney's office and get approval. (Hunter depo 93-96; JA pp. 2359-2362). Hunter, Donathan, Medlin, and two other MPD officers then met privately to discuss their concerns. (DOC 43-1, 2, 3; JA pp. 136-137, 162, 186-187). At that

meeting, the Plaintiffs decided to seek an investigation by state officials of alleged criminal misconduct and corruption.  (DOC 43-1, 2, 3; JA pp. 137, 162, 186-187).  Ultimately, they decided to contact the Attorney General's Office in order to begin an investigation into the alleged illegal activity    (DOC 43-1, 2, 3;   JA pp. 137-138, 162, 187-189).  They were advised by someone at the Attorney Generals' Office to contact the local authorities, but the Plaintiffs apparently did not trust the local authorities, so they contacted the Governor's office in an effort to get the State Bureau of Investigation ("SBI") to begin an investigation.  (DOC 43-1, 2, 3; JA pp. 138-140, 162-163, 189).  Subsequently, the SBI attempted to contact the Plaintiffs to begin the SBI's investigation into the alleged criminal misconduct.

However, as of the date of Plaintiffs' discharge on December 29, 2011, no one involved in the termination decision was aware the Plaintiffs had made any report to the Governor's Office.  (Cook aff. ¶ 18; JA p. 71, Matthews aff. ¶ 10; JA p. 87, Bralley aff. ¶ 19; JA p. 79).

Plaintiffs' evidence consists of speculation, hearsay, and other inadmissible assertions.  Plaintiffs have admitted in their depositions that they have no actual evidence to support their sole theory that they were terminated because they called the Attorney General or Governor's office.  Their theory is based on speculation or their own feelings.  They surmise that Chief Cook obtained the Tracphone number

that was used to call the Governor's office from SBI agent Smith, and somehow associated the phone number with the three Plaintiffs.

However, Plaintiff Medlin testified that he did not have any evidence to support his "feeling" as to what led to his termination.

> Q.    You don't have a piece of paper that says -- that shows or even implies that Agent Smith gave the Tracfone number to Chief Cook, do you?
>
> A.    I do not.
>
> Q.    You don't have a statement from any person in this entire world that says, "I believe or I know that Agent Smith gave the Tracfone number to Chief Cook"?
>
> A.    You're right.
>
> Q.    What you have is your feeling?
>
> A.    Correct.  A lot of investigations is solved off of feeling, and I have -- you know, I have taken cases to the grand jury that -- you know, a stabbing case that I didn't have the knife in my hand either, you know, but a lot of it you take to the grand jury with the information that you have, and that makes that decision.
>
> Q.    And that makes that decision based on a feeling and no evidence?
>
> MS. MADDUX:    Objection.
>
> THE WITNESS:    Based on the evidence that you have and the information from the officer testifying.
>
> Q.    (Mr. Flanagan)    And you don't have any evidence in this case at all ---

MS. MADDUX:    Objection.

MR. FLANAGAN:        --- that Agent Smith gave the Tracfone number to Chief Cook or anybody else associated with the town.  And you've testified to that already.

THE WITNESS:   The information I have is the phone numbers that was connected to the Tracfone.

Q.    (Mr. Flanagan)    All right. That because you and Donathan called, the Tracfone number would be on the town's phone records.  Right?

A.    Yes, sir.

Q.    And Chief Smith (sic) -- you have no evidence that Chief Smith (sic) went to Christine Bralley and got phone records, or those particular phone records that would  show that, do you?

A.    Chief ---

Q.    Chief Cook.

A.    I don't have any evidence to that, no, sir.

(Medlin Depo., pp. 203-205; JA pp. 2730-2732).

Similarly, Plaintiff Hunter testified as follows:

Q.    All right.  You don't have any evidence at all that SBI Agent Smith spoke with Cook and Matthews about  these allegations that you gave -- you, Donathan, and Medlin gave to either the attorney general's office or  the governor's office?

A.    No, sir.

Q.    Are you aware of whether Medlin or Donathan have any evidence whatsoever that Smith talked with Matthews or Cook about these allegations from the Governor's office or the AG's office?

19

A.    I'm not aware.

Q.    Do you have any evidence whatsoever that SBI Agent Smith spoke with anyone associated with the Town of Mocksville about these allegations that you gave, you, Medlin, and Donathan, gave to the attorney general's office or the governor's office?

A.    No, sir.

(Hunter Depo., pp. 129-130; JA pp. 2395-2396).

Finally. Plaintiff Donathan testified that this theory is based solely on the fact that he was terminated, and nothing else:

Q.    Do you believe that Chief Cook, prior to your termination, was aware of the number of the Tracfone that Mr. Hunter's daughter bought?

A.    Yes, sir, I do.

Q.    How do you -- what do you base that belief on?

A.    Because I was terminated.

Q.    Anything else?

A.    There is no other reason.  My record was clean.  I had no write-ups.  Done nothing wrong.  Had just got promoted.

Q.    What evidence do you have that Chief Cook was aware of the Tracfone number?

A.    That's the only thing that I could have been terminated for.

Q.    Okay.

A.    That's the only thing.

20

Q.    Is there any evidence -- do you have any evidence -- do you have a statement from someone, a document?

A.    No, sir.

(Donathan Depo., p. 12; JA p. 2077).

In contrast to the Plaintiffs' unsubstantiated assertions, the actual and uncontroverted evidence is that SBI Agent Smith was directed by his SBI Supervisor Carson to perform an initial investigation of the anonymous call made to the Governor's Office.  As part of the investigation, Agent Smith called the Tracfone in a futile attempt to reach the anonymous callers.  He did not speak to Cook or Matthews about it until after the Plaintiffs' termination and did not give them the Tracphone number (Smith Depo. pp. 50-53, 98; JA pp. 1671-1674, 1719). While Smith was at the MPD during the week of December 19, 2011, he was there to discuss the use of the Davie County Law Enforcement Association building for a crime scene processing class. (Matthews Depo, pp 326-329; JA pp. 1596-1599). There is no evidence to the contrary.

## SUMMARY OF THE ARGUMENT

Defendants are entitled to judgment as a matter of on Plaintiffs' state and federal First Amendment claims because it is undisputed that Plaintiffs' duties and obligations as law enforcement officers included the reporting and investigation of misconduct.  Because they spoke as employees rather than citizens, their report of alleged misconduct by the Police Chief to the Governor's office is not protected

speech under *Garcetti v. Ceballos*, 547 U.S. 410, 164 L. Ed. 2d 689, 126 S. Ct. 1951 (2006).  Moreover, the evidence fails to create a genuine issue of fact with respect to the testimony of Cook, Bralley and Matthews that they did not know about the Plaintiffs' report to the Governor's office until after their terminations.

Further, summary judgment should have been entered in the individual Defendants' favor as to Plaintiffs claims based upon qualified immunity because this case does not implicate a "clearly established" right.  On the contrary, under *Garcetti*, there was no violation of Plaintiffs' rights at all.

## ARGUMENT

### I.    STANDARD OF REVIEW

The rulings on appeal involve the denial of Defendants' Motion for Summary Judgment.  On appeal, the district court's rulings are reviewed *de novo*. *Drewitt v. Pratt*, 999 F.2d 774, 778 (4th Cir. 1994); *Higgins v. E. I. Dupont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988).  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a party moving for summary judgment is entitled to prevail when there are no genuine disputes of material facts and the moving party is entitled to prevail as a matter of law.  Fed. R. Civ. P. 56(a).

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STATE AND FEDERAL FIRST AMENDMENT RETALIATION CLAIMS.

Plaintiffs' First Amendment retaliation claims should be dismissed because, when speaking as employees rather than citizens, they did not engage in constitutionally protected speech. Further, there is no genuine dispute regarding the testimony of Cook, Bralley, and Matthews that none of them was aware at the time of Plaintiffs' termination that they had contacted the Governor's Office to request an investigation.

### A. Plaintiffs' speech was not protected because they spoke as employees, not as citizens.

When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. *Garcetti v. Ceballos*, 547 U.S. 410, 164 L. Ed. 2d 689, 126 S. Ct. 1951 (2006). In *Garcetti*, the Supreme Court held that a district attorney was not speaking as a citizen when he wrote a memorandum setting forth allegations of governmental misconduct; he was doing his job. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of control over what the employer itself has commissioned or created." *Id.*, 547 U.S. at 421-22.

23

### 1. Whether the Plaintiffs spoke as employees or citizens is a threshold issue.

Numerous courts have held that whether a plaintiff spoke as an employee or citizen is a threshold issue. *See*, *Chaklos v. Stevens*, 560 F.3d 705, 711-12 (7th Cir. 2009) ("[*Garcetti*] requires a threshold determination regarding whether the public employee spoke in his capacity as a private citizen or as an employee."); *Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) ("it is clear that [*Garcetti*] added a threshold layer to our previous analysis"); *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007) (the court must decide "at the outset (1) if the government employee spoke as an employee or citizen…"); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 545 (6th Cir. 2007) ("the threshold inquiry [is] whether the speech was, in fact, made pursuant to the employee's official duties"); *Williams v. Dallas Ind. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) ("[t]he Supreme Court's recent pronouncement in *Garcetti v. Ceballos* added a threshold layer…").

### 2. Speech can be part of a public employee's official duties even if it is not required by the employer or contained in a job description.

In determining the scope of an employee's duties, "[t]he proper inquiry is a practical one" that should focus on "the duties an employee actually is expected to perform," not on formal job descriptions. *Id.*, at 424-25. Speech can be "pursuant to" a public employee's official job duties "even though it is not required by, or

included in, the employee's job description, or in response to a request by the employer." *Weintraub v. Board of Education*, 593 F.3d 196, 203 (2d Cir. 2010).

For example, in *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689 (5th Cir. 2007), the Fifth Circuit concluded the plaintiff, as Athletics Director, spoke pursuant to his official duties in writing memoranda to his school principal and office manager even though he was under no obligation to do so. The *Williams* court explained that "[s]imply because [the plaintiff] wrote memoranda, which were not demanded of him, does not mean he was not acting within the course of performing his job"; instead, "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties." *Id.*, 480 F.3d at 694. See also, *Phillips v. City of Dawsonville*, 499 F.3d 1239, 1242 (11th Cir. 2007) ("a public employee's duties are not limited only to those tasks that are specifically designated"); *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1203 (10th Cir. 2007) ("[S]peech relating to tasks within an employee's uncontested employment responsibilities is not protected from regulation. This may be true even though the speech concerns an unusual aspect of the employee's job that is not part of his everyday functions"); *Freitag v. Ayers*, 468 F.3d 528, 544 (9th Cir. 2006) (relevant inquiry is whether the speech was a product of "perform[ing] the tasks [the employee] was paid to perform"); *Mills v. City of Evansville*, 452 F.3d 646 (7th Cir. 2006).

### 3. *Investigating and reporting crime is the core responsibility of sworn police officers.*

Reporting allegations of criminal conduct was among the Plaintiffs' central duties as law enforcement officers and expressly required by MPD policy. This includes determining the appropriate agency to investigate a particular crime. Plaintiffs acknowledge they had considered taking out warrants on their own, and that the purpose of their call to the Governor's Office was to request an investigation. Plaintiffs specifically identified themselves as police officers when they called.

As sworn officers of the MPD, Plaintiffs were bound by an oath of office and the provisions of the Mocksville Police Manual. The oath of a sworn officer provides among other things that he will "be alert and vigilant to enforce the criminal laws of this State[.]" The Manual provides specifically that law enforcement officers shall:

- enforce the law with "relentless prosecution of criminals;"

- take appropriate action on the occasion of a crime, disorder, or other act or condition deserving police attention;

- detect and arrest violators of the law;

- enforce all Federal, State, and City laws and ordinances coming within departmental jurisdiction;

- cooperate with all Law Enforcement agencies by giving aid and information to such organizations;

- in appropriate circumstances, report a matter or refer a complaint to a more suitable agency;

- report violations of laws, ordinances, or rules by other officers.

(Matthews aff. Exh. A; JA pp. 3284-3361).

Plaintiffs own retained expert, Melvin Tucker, issued a report indicating, among other things, that the Plaintiffs had an affirmative duty to report what in good faith they believed to be misconduct on the part of Chief Cook. (Expert Report of Melvin L. Tucker; JA p. 557). Tucker also testified:

> Q.  In your opinion number two, which begins on page seven, again paraphrasing, you indicate that the Plaintiffs had an affirmative duty to report in good faith what they believed to be misconduct on the part of Cook.
>
> A.  That's correct.

(Tucker Depo., 72-73; JA pp. 3117-3118).

Numerous courts construing *Garcetti* have held that a police officer's report of corruption, even outside the chain of command, constitutes speech pursuant to his official duties, and therefore is unprotected by the First Amendment. In *Morales v. Jones*, 494 F.3d 590 (7th Cir. 2007), the Seventh Circuit Court of Appeals held there was no First Amendment protection where a police officer reported to an assistant district attorney that the Chief and Deputy Chief had harbored a felon.

The Court noted that reporting crimes is part of a police officer's job, stating, "Furthermore, the Milwaukee Police Department requires officers to report all potential crimes.  By informing [the district attorney] of the allegations against [the Chief and Deputy Chief], Morales was performing that duty as well. Accordingly, his conversation with [the district attorney] is not protected under the First Amendment after *Garcetti.*"  *Id.,* 494 F.3d at 598.

Similarly, in *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331 (D. Md. 2011), the Court held a police officer's report of overtime abuse by several fellow officers was not protected because a General Order governing the Baltimore Police Department mandated the reporting of "any acts of misconduct including, but not limited to, discrimination, harassment, criminal conduct, or any other misconduct activity detrimental to the operation of the Department[.]"  *Id.*, 807 F. Supp. 2d at 350.

In *Brady v. County of Suffolk*, 657 F. Supp. 2d 331 (EDNY 2009), the Court held that a police officer spoke pursuant to his duties, not as a citizen, in criticizing the department's alleged policy of not issuing traffic tickets to off-duty law enforcement officials and individuals in possession of Police Benevolent Association membership cards.  The Court noted that "one of plaintiff's core job functions" was to enforce the State's vehicle and traffic laws by issuing traffic summonses.  *Id.*, at 344.

28

In *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116 (2d Cir. 2009) the Second Circuit rejected the Plaintiffs' argument that his allegations of corruption to a District Attorney were protected under the First Amendment because he "went outside the chain of command to make statements to a neutral third party[.]" The Court noted that in Anemone's job, he regularly interacted with District Attorneys' offices and that cooperating with them was among his duties. Even where such communications were expressly forbidden by Anemone's supervisor, the Court concluded they were "clearly official, part and parcel of his duties," and therefore did not constitute protected speech. *Id.*, 629 F.3d at 116.

In *Sigsworth v. City of Aurora, Illinois*, 487 F.3d 506 (7th Cir. 2007) the plaintiff, an Aurora police officer, alleged he was retaliated against for reporting his suspicions that fellow members of a multi-agency drug task force had tipped off drug dealers in advance of raids, allowing them to evade arrest. The Court noted the Aurora Police Department had a policy of cooperation with the FBI, ATF, and other task force agencies. Further, "In accordance with the policy of cooperation and orders to communicate with the deputy chief of police, [plaintiff] reported the observed misconduct connected to the operation that he had helped to conceive and for which he had supervisory responsibilities. Because [plaintiff's] speech was part of the tasks he was employed to perform, he spoke not as a citizen

but as a public employee, and that speech is not entitled to protection by the First Amendment." *Id.*, 487 F.3d at 511.

Finally, in a case strikingly similar to this case, the Court in *Cheek v. City of Edwardsville, Kansas*, 514 F. Supp. 2d 1220, 1231 (D. Kansas 2007), expressly rejected Plaintiffs' argument "that their speech should be entitled to protection solely because it was made to an outside agency." The Plaintiffs in *Cheek* were police officers who went outside the chain of command to report allegations of corruption against the Chief of Police directly to the Attorney General's office. In holding their speech pursuant to their duties, the Court stated:

> The determination of which agency to refer the various matters, and how to accomplish that referral, was an exercise of their professional judgment. Additionally, their subsequent discussions with the AG's investigators fell within the scope of their employment duties, as established by [plaintiff's] testimony that any police officer had a duty to cooperate with the AG's office in an investigation by that agency.

*Id.*

As shown, the Plaintiffs were expected as Mocksville police officers to report crimes, including to other agencies where appropriate, and to cooperate with all law enforcement agencies by giving aid and information. Their action in calling the Governor's Office was pursuant to their official duties even though they went outside the chain of command. When a police officer reports a crime, he is literally just doing his job. Therefore, the report is not protected speech under the First Amendment.

30

**B.    Plaintiffs' speech was not the "but for" cause of their termination.**

To satisfy the causation element of a § 1983 First Amendment retaliatory discharge claim, the employee must show that his protected expression was a "substantial" or "motivating" factor in the employer's decision to terminate him. *Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993). Plaintiffs' forecast of evidence fails to meet this burden. Even if a protected expression was part of the reason for discharge, an employer may still avoid liability by showing it would have made the made the same decision in the absence of the protected speech. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 471 (1977). In short, the employee must show that "but for" the protected expression the employer would not have taken the alleged retaliatory action. *Huang v. UNC Board of Governors*, 902 F.2d 1134 (4th Cir. 1990). The purpose of this rule is to prevent a government employee from insulating himself from legitimate termination simply by engaging in protected speech. *Wagner*, 13 F.3d at 90.

Plaintiffs allege they were fired for raising concerns about improper activity in the MPD to Christine Bralley and for making an anonymous report to the Governor's Office. However, the evidence shows that no one involved in the termination decision was aware of the calls to the Governor's Office. Moreover, there were numerous legitimate reasons justifying the Plaintiffs' discharge. Accordingly, the Plaintiffs cannot show a "but for" connection between any

protected expression and the termination of their employment. For this reason, Defendants are entitled to summary judgment.

### 1. Chief Cook Was Unaware the Plaintiffs Had Called the Governor's Office When He Decided to Terminate the Plaintiffs' Employment

Plaintiffs' evidence does not show that Chief Cook or Bralley knew, at the time that of the decision to terminate the Plaintiffs' employment, that the Plaintiffs (or anyone else) had made anonymous reports to the Governor's Office. Cook, Matthews, and Bralley expressly deny having any knowledge of the Plaintiffs' anonymous reports until after the Plaintiffs had already been terminated.

The circumstantial evidence cited by the District Court as creating a disputed question of material fact is nothing more than a chain of speculation and inference. The Plaintiffs cannot create genuine issues of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

Since Chief Cook was not aware the Plaintiffs had contacted the Governor's Office, he could not have fired them in retaliation for it. Plaintiffs' evidence does not show their anonymous reports were the "but-for" cause of their termination. On the contrary, their calls to the Governor's Office could not have factored into the decision at all. Accordingly, summary judgment should have been entered in favor of the Defendants.

### 2.    *Chief Cook Had Legitimate Reasons for Terminating the Plaintiffs' Employment*

As shown above, there were numerous, serious reasons justifying the termination of the Plaintiffs' employment. Because these reasons exist, and because there is no evidence Chief Cook based his decision on the Plaintiffs' alleged protected speech, the Plaintiffs cannot create a genuine issue regarding the "but for" cause of their termination. Even if Chief Cook had known about the Plaintiffs' anonymous reports to the Governor's Office, the overwhelming evidence indicates he still would have been justified in terminating their employment based on their numerous conduct issues. Plaintiffs do not establish causation where, as here, the evidence proves the Town would have made the same decision even in the absence of the allegedly protected conduct. *Hughes v. Bedsole*, 48 F.3d 1376 (4th Cir. 1995).

## III.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Governmental officials performing discretionary functions are entitled to qualified immunity as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 438 U.S. 635, 638, 107 S. Ct. 30, 34, 97 L. Ed. 2d 523 (1987). The test for evaluating a defense of qualified immunity under § 1983 is whether the Defendants, in performing discretionary functions, have engaged in conduct that

violates "[c]learly established constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

Qualified immunity is analyzed in a two-step process: The court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999). A right is "clearly established" only if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*, 526 U.S. at 614-15. "[T]he contours of the right must have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999).

Under *Harlow*, governmental officials sued individually for constitutional violations are protected by qualified immunity to avoid "social costs" such as "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from the acceptance of public office." *Harlow*, 457 U.S. at 814. The test evaluating the availability of immunity focuses on the objective legal reasonableness of an official's act. "[R]eliance on the objective reasonableness of an official's conduct, as measured by reference to clearly

established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow*, 457 U.S. at 818.

Government officials performing discretionary functions are entitled to qualified immunity and are shielded from civil damages "[a]s long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson*, 438 U.S. at 638. Qualified immunity protects "[a]ll but the plainly incompetent or those who knowingly violate the law." *Dunbar v. Lindsey*, 905 F.2d 754, 763 (4th Cir. 1990). In *Hunter v. Bryant*, the Supreme Court stated that the qualified immunity standard "gives ample room for mistaken judgments." 502 U.S. 224, 229, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991), quoting *Malley v. Briggs*, 475 U.S. 335, 343, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986). The Court does "not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues. Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

In this case, Plaintiffs' evidence is insufficient to show that there was any constitutional deprivation at all. Even if Plaintiffs could make this showing, there is no evidence Cook or Bralley had any reason to believe their actions were in

violation of any clearly established right. On the contrary, the record demonstrates that both of the individual Defendants made reasonable efforts, including consulting with the Town Attorney, to confirm the Plaintiffs' termination was lawful. Under these circumstances, Cook and Bralley are entitled to qualified immunity.

In *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003), the Court noted that the Fourth Circuit has emphasized, "the importance of resolving the question of qualified immunity at the summary judgment stage rather than at trial." This Court further stated, a right cannot be considered "clearly established" for the purposes of qualified immunity if courts disagree about the contours of the right. "If judges thus disagree on a constitutional question, it is unfair to subject [government officials] to money damages for picking the losing side of the controversy." *Wilson*, 526 U.S. at 618.

Finally, this Court has made clear that, "particularly in First Amendment cases, where a sophisticated balancing of interests is required to determine whether the plaintiff's constitutional rights have been violated, 'only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected.'" *McVey*, 157 F.3d at 277, quoting, *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995)).

In the instant case, the parties exchanged thousands of documents, obtained in excess of 15 depositions encompassing many hours and thousands of pages of testimony.  Plaintiffs hired a former police chief of a large metropolitan area to give his expert testimony, and the parties filed legal memoranda and supporting documents in an effort to determine whether the Plaintiffs' constitutional rights were violated.  In that light, it cannot be said that Cook and Bralley should have known that their actions violated Plaintiffs clearly established rights.

The District court cited *Durham v. Jones*, 737 F.3d 291 (4th Cir. 2013) and *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009) in holding that the Plaintiffs' rights were "clearly established."  However, *Durham* and *Andrew* are distinguishable because both cases involve statements directed to the news media and public.  The speech at issue in the instant case was directed solely to an agency of the government for the purpose of initiating an investigation.[1]

As set forth above, Defendants have consistently argued that Plaintiffs' speech was not protected because, under *Garcetti v. Ceballos*, 547 U.S. 410, 164 L. Ed. 2d 689, 126 S. Ct. 1951 (2006), it was made pursuant to their official duties as sworn officers of the Mocksville Police Department.  *Jones* neither analyzes, cites, nor even mentions *Garcetti*.  In *Jones* this Court found the plaintiff engaged

---

[1] The District Court noted that the Plaintiffs also met with the NAACP, however there is no evidence, not even circumstantial evidence, that Cook, Bralley, or Matthews knew about this meeting.  Plaintiffs do not contend they were retaliated against for meeting with the NAACP.

in protected speech when he sent a "packet of materials to: 1) the Somerset County State's Attorney; 2) the Governor of Maryland; 3) the Police Academy where he had been trained; 4) the Maryland Police Training Commission; and 5) the Maryland State Police. In addition, he sent the packet to a number of media outlets, such as the local newspaper, The Daily Times of Salisbury, Maryland, and two local television stations, WBOC TV 16 and Fox 21 News." *Jones*, 737 F.3d 291, 297. He later sent the same materials to "various political officials, including a Senator in Virginia[.]" *Id*. The Court described this as "proactive measures of a highly public nature." *Id*.

The plaintiff in *Jones* told investigators that "he sent out these materials 'to expose and to alert the public of the corruption that had taken place.'" *Id*. In finding that the speech was on a matter of public concern, the Court noted that it was directed to a "broad audience," and further, that the speech "interested the media[.]" *Id*., at 300.

In *Andrew*, the plaintiff wrote a memorandum about an officer-involved shooting, expressing concerns about whether the shooting was justified and whether its investigation was handled properly. The plaintiff sent his memorandum to a reporter from the Baltimore Sun, which ran an article raising the same questions about the shooting.

In contrast to *Jones* and *Andrew*, the Plaintiffs in this case directed their speech not to the public or the media, but to a government agency they determined to be appropriate for reporting allegations of criminal misconduct in the MPD. The Plaintiffs' speech in this case existed in a completely different context from that in *Jones* and *Andrew*.

Neither *Jones* nor *Andrew* supports the conclusion that a police officer's report of misconduct to a government agency is protected by the First Amendment. Accordingly, it cannot be said that such a right is clearly established. For this reason, Cook and Bralley are entitled to qualified immunity.

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendant-Appellants respectfully request that Judge Eagles' Order and rulings be reversed to the extent that Defendants' Motion for Summary Judgment was denied. Defendants request that this action be dismissed in its entirety.

This 28th day of April, 2014.

CRANFILL SUMNER & HARTZOG LLP

BY:  /s/Patrick H. Flanagan
     PATRICK H. FLANAGAN, State Bar No. 17407
     Post Office Box 30787
     Charlotte, North Carolina 28230
     Telephone:  (704) 332-8300
     Facsimile:   (704) 332-9994
     E-Mail: phf@cshlaw.com

     *Attorneys for Defendants-Appellants*

     VAN HOY, REUTLINGER, ADAMS & DUNN

BY:  /s/ Philip M. Van Hoy
     PHILIP M. VAN HOY, State Bar No. 5869
     /s/ Stephen J. Dunn
     STEPHEN J. DUNN, State Bar No. 25796
     737 East Boulevard
     Charlotte, NC 28203
     Telephone:  (704) 375-6022
     Facsimile:  (704) 375-6024
     Email:       phil.vanhoy@vradlaw.com
                  steve.dunn@vradlaw.com

     *Attorneys for Defendants-Appellants*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

  this brief contains <u>8,725</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

  this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

CRANFILL SUMNER & HARTZOG LLP

BY:   <u>/s/Patrick H. Flanagan</u>
    PATRICK H. FLANAGAN, State Bar No. 17407
    Post Office Box 30787
    Charlotte, North Carolina 28230
    Telephone:  (704) 332-8300
    Facsimile:   (704) 332-9994
    E-Mail: phf@cshlaw.com

  *Attorneys for Defendants-Appellants*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 28th day of April, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Robert M. Elliott
> Helen L. Parsonage
> Elliot Morgan Parsonage
> 426 Old Salem Road
> Brickenstein-Leinbach House
> Winston-Salem, NC  27101
> rmelliot@emplawfirm.com
> hparsonage@emplawfirm.com

> *Counsel for Plaintiff-Appellee/Cross-Appellant*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

> /s/ Adrienne R. Acra-Passehl
> Adrienne R. Acra-Passehl
> GIBSON MOORE APPELLATE SERVICES, LLC
> 421 East Franklin Street
> Suite 230
> Richmond, VA  23219